# In the United States Court of Federal Claims

No. 22-1215
(Filed: January 3, 2023)
(Re-filed: January 10, 2023)[1]

* * * * * * * * * * * * * * * * * * * * * * * * *

SLS FEDERAL SERVICES, LLC,

      *Plaintiff*,

v.

THE UNITED STATES,

      *Defendant*,

and

JACOBS PROJECT MANAGEMENT CO.,

      *Intervenor*.

* * * * * * * * * * * * * * * * * * * * * * * * *

Bid protest; post-award bid protest; price reasonableness; discussions; FAR 15-404-1; DFARS 215.306; *Blue & Gold*; injunction

    *Kyle R. Jefcoat,* Washington, DC, for plaintiff, SLS Federal Services with whom were *David R. Hazelton*, *Leah Friedman*, *Genevieve Hoffman*, *W. Allen Perry*, and *W. Blake Page*, of counsel.

    *Liridona Sinani*, Attorney, United States Department of Justice, Commercial Litigation Branch, with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Nicolle A. Vasquez*, Naval Facilities Engineering Systems Command Atlantic, of counsel.

    *Robert J. Symon*, Washington, DC, for intervenor, Jacobs Project Management Co., with whom was *Patrick R. Quigley* and *Lisa A. Markman* of counsel.

---

[1] This opinion was originally issued under seal, and the parties were given an opportunity to propose redactions of any protected material. The parties agreed that none were necessary, so it appears in full.

OPINION

This is a post-award bid protest of the Naval Facilities Engineering Systems Command's (agency) decision to award indefinite-delivery, indefinite-quantity contracts to six contractors. Plaintiff, SLS Federal Services, LLC, argues that the agency ignored regulatory requirements, failed to follow the solicitation's terms, and engaged in an unequal and arbitrary evaluation of its proposal. As a result, SLS seeks a permanent injunction against the agency's decision.

The matter is now fully briefed on cross-motions for judgment on the administrative record. Oral argument was held on December 8, 2022. We sustain SLS's protest and, for the reasons set out below, enjoin the agency from proceeding with performance of the contracts.

BACKGROUND

From time to time, the Department of Defense and other federal agencies must respond to global emergencies, like natural disasters or humanitarian conflicts. Responding to global emergencies often requires, among other things, construction and engineering services. To secure those services, agencies sometimes enter into "global contingency construction" contracts in which a contractor's performance can arise anytime and anywhere. Administrative R. (AR) 251.

In this case, the agency issued Solicitation N62470-20-R-5003, looking to award approximately four indefinite delivery, indefinite quantity contracts for global contingency construction. As for how those contracts would be awarded, the agency was clear: awards would be made to the contractors whose offers "represented the best value to the Government." AR 822. And best value, the agency instructed, would be determined through a tradeoff analysis that considered both cost and non-cost factors.[2] Once the contracts were awarded, the awardees would then later compete for either cost-plus-award-fee or firm fixed price task orders with a maximum contract value of $5 billion.

Most important within the agency's tradeoff analysis was cost. To consider cost, the solicitation required contractors to submit cost proposals,

---

[2] The non-cost factors were (1) corporate experience, (2) safety, (3) small business utilization and participation, and (4) past performance.

2

which the agency would analyze for both cost and price reasonableness. That said, the agency—whether by oversight or intention—requested only cost data, like hourly labor rates and indirect ceiling rates. Those figures, while helpful to understand a contractor's reimbursable expenses, did not include any anticipated profit and left a hole in the agency's evaluation. That is because the agency planned to control cost by using firm fixed price "task orders whenever possible." AR 32. In fact, of the two contract-line-item numbers (CLIN), the agency explained that over half of all work would be performed under CLIN 002 as firm fixed price task orders. *See* AR 252 (anticipating that $3 billion of all task orders would be firm fixed price).

More broadly, the agency's evaluation of offers involved three entities, and the interplay between them worked as follows. First, the Evaluation Board would independently evaluate each factor outlined in the solicitation. It would then compile its review into essentially two reports, one for non-cost factors and one for cost. After that, the Advisory Council would review the Board's findings, consolidate the findings into its own report, and "make[] an award recommendation." AR 258. At that point, the Source Selection Authority would review the recommendations, and if it believed that discussions were unnecessary, it would select the contractor whose "proposal offers the best value to the government." *Id.*

The agency advised contractors that it intended to award contracts without discussions. It reserved the right to use them if the need arose, but it never did. Instead, at nearly every stage of evaluating offers, the agency reaffirmed its intent to award contracts without discussions because, in its view, the offers were clearly awardable.

In the end, the agency awarded contracts to six (out of nine) bidders but not SLS.[3] Unhappy with the agency's awards, SLS filed a protest with the Government Accountability Office (GAO). Among other things, SLS argued that the agency should have conducted discussions and that it also erroneously analyzed price reasonableness. Finding "potential merit" in SLS's "price reasonableness" argument, the agency agreed to take corrective

---

[3] The agency awarded contracts to (1) Aptim Federal Services; (2) CDM, a Joint Venture; (3) ECC Contingency Constructors, LLC; (4) Gilbane Federal; (5) Jacobs Project Management Co.; and (6) Perini Management Services, Inc.

3

action so that it could "address the evaluation of the proposals, including, but not limited to, price reasonableness." AR 11389. On that basis, the GAO dismissed SLS's protest.

Nearly a year after the notice of corrective action, the agency announced that the awards would remain the same. In the Evaluation Board's report, it disclosed that the only corrective step it took was to remove an "inappropriate CPARS evaluation." AR 11417. Outside of that, "[t]here were no additional amendments or requests for proposal revisions made in pursuance of th[e] corrective action." *Id.* Because little changed from the agency's initial evaluation, SLS filed a second protest with the GAO. Disputes over document production then ensued, so SLS filed its protest with this court.

## DISCUSSION

### I. The agency's corrective action did not cure the original procurement defect.

We review bid protests in accordance with the standards laid out in the Administrative Procedure Act (APA). *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (citing 28 U.S.C. § 1491(b)(1) (1996)). Under the APA, an agency's actions cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2018). In the context of corrective action, that means that an agency's decision must be "reasonable under the circumstances and appropriate to the impropriety." *PGLS, Inc. v. United States*, 152 Fed. Cl. 59, 69 (2020).

#### A. *Blue & Gold* does not bar SLS's challenge to the agency's corrective action.

SLS complains that the agency was incapable of evaluating price reasonableness because the agency never requested or considered any pricing information. At its core, SLS's broader argument amounts to a challenge to the solicitation's structure. In effect, SLS argues that the solicitation did not request enough information for the agency to perform its promised price reasonableness analysis.

Jacobs, as intervenor in this protest, answers that SLS waived its price reasonableness argument, relying on *Blue & Gold Fleet v. United States*. 492

4

F.3d 1308, 1313 (Fed. Cir. 2007). It explains that SLS should have noticed the solicitation's defect and challenged it before the competition concluded. Because SLS did not do so, its challenge is untimely.

In a typical bid protest, Jacobs's waiver defense would likely prevail. Indeed, SLS conceded at oral argument that its GAO challenge could have been dismissed as too late. The agency could have raised the waiver defense at GAO (and then at this court), and, if it had, the protest would be over—at least as far as price reasonableness is concerned. What makes this protest atypical, however, is that those events never occurred. The agency did not raise the waiver defense at GAO. Instead, the agency promised to take corrective action. That choice allows SLS to challenge the agency's execution of that corrective action. *See Amazon Web Servs., Inc. v. United States*, 153 Fed. Cl. 602, 607 (2021). The agency cannot later (and for the first time) hide behind *Blue & Gold* when its corrective steps fail to solve the problem.[4]

### B. The agency failed to correct its improper price reasonableness analysis.

With SLS clearing the *Blue & Gold* hurdle, we turn to the merits of SLS's price reasonableness argument. Recall that SLS takes issue with the agency's solicitation. In particular, it contends that the agency failed to request any pricing information, which, in turn, made it impossible to analyze price reasonableness. The essence of SLS's position is this. A problem existed because the solicitation failed to request pricing information. At the GAO, the agency promised to take corrective action, which was assertedly to address a possible price reasonableness defect. Yet, in the time between the notice of corrective action and the new awards, the agency never acquired the missing price data. As a result, the agency remained unable to analyze price reasonableness.

The government's response is twofold, though the two positions are difficult to reconcile. On the one hand, the government reminds us that this

---

[4] Parties may forfeit rights and defenses when they fail to timely assert them. *See, e.g.*, *United States v. Olano*, 507 U.S. 725, 733 (1993). Instead of asserting its waiver defense, the agency chose to initiate corrective action, in part, at least, directed at fixing the asserted defect with the solicitation. For better or worse, the agency is bound by that decision.

is a global contingency construction contract. Because the nature of performance is unknown, it would be "impossible" to evaluate firm-fixed-price proposals. Yet on the other hand, the government also assures us that it did analyze price reasonableness using FAR 15.404-1(b). It understands that provision to mean that a comparison of costs plus adequate competition equals a fair and reasonable price.

We hold that the agency's corrective action was unreasonable and failed to address the original "impropriety." *PGLS*, 152 Fed. Cl. at 69. We begin with FAR 15.404-1.[5] Under subsection (a)(2), an agency "shall" use price analysis "when certified cost or pricing data" is not required. FAR 15.404-1(a)(2). If we look to Section 15.403-1(b), we see that this procurement falls within subsection (a)(2) as a case in which contractors need not provide certified data. That is because an agency "shall not require certified cost or pricing data" when it "determines that prices agreed upon are based on adequate price competition." 15.403-1(b)(1). And adequate price competition exists when, as here, an award "will be made to the offeror whose proposal represents the best value [and] where price is a substantial factor in source selection." 15.403-1(c)(1)(i)(B).

Because certified data was not required, we return to Section 15.404-1. Subsection (a)(2) requires the agency to use price analysis, which the section defines as "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." 15.404-1(b)(1). Or put another way, subsection (b)(1) allows an agency to determine a price's reasonableness without going line-by-line through the constituent cost elements. One acceptable method of doing that is to simply compare the prices received when adequate competition exists. Normally, that will "establish[] a fair and reasonable price." 15.404-1(b)(2)(i).

With these principles in view, the agency did not (and could not) analyze price reasonableness under FAR 15.404-1(b). Simply put, the regulation—which allows evaluation of price without separately considering

---

[5] Admittedly, the parties do not address the contours of Section 15.404-1 in this level of detail. But "when an issue or claim is properly before the court," we "retain[] the independent power to identify and apply the proper construction of the governing law." *U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993).

cost—presupposes that agencies possess, at the very least, some pricing information. Here, the parties do not appear to dispute that the agency never requested, received, or evaluated any price data from the bidders. Instead, the agency requested cost information, such as hourly labor rates, which helped it determine a contractor's reimbursable expenses but not its prices. As a result, the solicitation's structure left the agency without the necessary information to perform a price analysis. That problem then survived the agency's corrective action because the agency never attempted to fill that void. The agency could not evaluate price reasonableness without pricing information.

In defense of the agency, the government flips subsection (b)(1) on its head. The government starts with an accurate description of price analysis under subsection(b)(1), and it also correctly explains that one method of price analysis is a "[c]omparison of proposed prices received" when "adequate price competition exists." 15.404-1(b)(2)(i). It is what comes after that departs from the regulation's text. From here, the government explains that the agency reviewed the cost proposals and determined that they were "complete, reasonable, and realistic." AR 11639. Combining that, then, with adequate competition, the agency concluded that its comparison of cost proposals could therefore establish a reasonable price.

The agency's approach lacks the regulation's support. By its plain language, subsection(b)(1) empowers agencies to review proposed prices "*without evaluating its separate cost elements*." 15.404-1(b)(1) (emphasis added). But the reverse is not true. The agency does not perform a price analysis when it evaluates the separate cost elements and ignores price. Instead, and as subsection(c)(1) explains, that is called "cost analysis." 15.404-1(c)(1).[6] Price—though it encompasses cost—is broader and includes a contractor's anticipated profit. *See* 15.404. The agency must compare *prices* to satisfy 15.404-1(b), which it failed to do here.

To the government's point that a price analysis would be impossible, we have found other procurements where agencies have evaluated price reasonableness in similar contexts. For instance, the Army Corps of Engineers found a way to evaluate contractors' prices in a contract for debris

---

[6] More specifically, cost analysis is the "review and evaluation of any separate cost elements." 15.404-1(c)(1).

management operations after "natural or man-made disasters." *In re CrowderGulf, LLC*, B-418693.9 *et al.*, 2022 CPD ¶ 90, at *1 (Comp. Gen. Mar. 25, 2022). The agency devised a scheme where the government would provide a "set of estimated quantities for a 'likely emergency event' to take place in that region" and would multiply that by "the rates proposed by each offeror" to "arrive at the total evaluated price for each region." *Id.* at *3. In *NEQ, LLC v. United States*, the Environmental Protection Agency (EPA) contracted for "[e]nvironmental cleanup [in] response to natural disasters and terrorist activities." 88 Fed. Cl. 38, 41 (2009). There, too, the EPA managed to evaluate price reasonableness. *See id.* at 43, 51.

Presumably, an agency's price evaluation is harder with contingent or uncertain performance. But be that as it may, difficult is different from impossible. And "[m]aking that difficult decision was the agency's job"— one that it "failed to do" here. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020).

In sum, the agency's solicitation failed to request the pricing information that would enable it to analyze price reasonableness. Its corrective action never asked for any information to address that defect. Therefore, the agency's corrective action is unreasonable, and SLS did not waive its right to bring a challenge.

## II. The agency violated DFARS 215.306.

### A. DFARS 215.306 creates a presumption in favor of discussions that the agency failed to overcome.

SLS argues that the agency abused its discretion when it refused to engage in discussions. We agree. At this point, we think it is settled that DFARS 215.306 "create[s] a presumption in favor of" discussions. *Oak Grove v. United States*, 155 Fed. Cl. 84, 108 (2021).

Discussions promote an important public interest. Among other things, discussions "maximize the government's ability to obtain [the] best value," FAR 15.306(d)(2), by "allowing the offeror to revise its proposal," *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 744 (2014). Despite their importance, however, a contracting officer normally has the discretion to choose whether to use them. *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002).

8

This protest raises a more nuanced question about discussions. Under the DFARS—which supplements the FAR in all defense contracts—"contracting officers *should* conduct discussions" "[f]or acquisitions with an estimated value of $100 million or more." DFARS 215.306(c)(1) (emphasis added). The parties dispute if and how the word "should" alters the normal discretion that a contracting officer possesses under the FAR. To SLS, the regulation creates a presumption that discussions will take place and thus requires agencies to provide adequate justification if they wish to depart from the regulatory scheme. In response, and even though the agency never made such a claim when it proceeded without discussions, the government appears to argue that the regulation creates no such presumption, especially when the agency intends to award without discussions from the outset. We agree with SLS.

We begin with the regulation's text, which, if unambiguous, controls. *Aspen Consulting, LLC v. Sec'y of Army*, 25 F.4th 1012, 1016 (Fed. Cir. 2022). DFARS 215.306 provides that, "[f]or acquisitions with an estimated value of $100 million or more, contracting officers should conduct discussions." And according to the FAR, the word "should" means "an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance." FAR 2.101. The regulations' language is thus clear: for "acquisitions with an estimated value of $100 million or more" discussions are the "expected course of action" unless they are "inappropriate for a particular" procurement.

Although clear regulatory language means that the judicial inquiry into meaning is complete, precedent "confirms what is [already] clear from the [regulation's] plain language." *Wimberly v. Labor & Indus. Relations Comm'n of Miss.*, 479 U.S. 511, 522 (1987). In *Dell Federal Systems v. United States*[7]—which addressed a $5 billion computer hardware

---

[7] *Dell Federal*'s unique procedural posture deserves some explanation. After receiving 58 proposals, the Army decided against using discussions because it would "significantly delay award[ing]" contracts. *Id.* As a result, unsuccessful bidders filed a protest with the GAO. *Id.* at 988. In response to the protest, the Army took corrective action, which included, among other things, opening discussions with all remaining offerors. *Id.* At that point, however, two of the awardees (wanting the original award to stand) filed suit, arguing that the Army's corrective action was unreasonable. *Id.* at 989.

9

procurement—the Federal Circuit explained that, by using the word "should," the regulation contemplates that "discussions normally are to take place in these types of acquisitions." 906 F.3d 982, 995 (Fed. Cir. 2018) (citing FAR 2.10). Thus, when the Army chose not to use discussions for its own convenience, it created an "undisputed procurement defect." *Id.* at 996.

The government accepts that *Dell Federal* "generally stated" that discussions should take place in these types of acquisitions. But even so, the government argues that *Dell Federal* is distinguishable because it involved an agency's corrective action. That makes a difference, so the argument goes, because the case only stands for the proposition that discussions can be a reasonable corrective action.

We disagree with that narrow construction. For corrective action to be reasonable, it must be rationally related to the original action's defects. *Dell Fed.*, 906 F.3d at 994. Thus, when the court in *Dell Federal* concluded that the Army's proposed corrective action (i.e., using discussions) was "rationally related to the procurement's defects," it necessarily required considering if and how DFARS 215.306 limited a contracting officer's discretion. *Id.* at 995. In other words, the outcome in *Dell Federal* makes little sense if the regulation did not already create a presumption that discussions would occur.

Consistent with the Federal Circuit, this court has also interpreted DFARS 215.306 to create a presumption that agencies will conduct discussions for defense acquisitions of $100 million or more. For example, in *Oak Grove v. United States*, this court reviewed a $245 million Army procurement that proceeded without discussions. 155 Fed. Cl. at 90–91. Applying *Dell Federal*, this court concluded that "conducting discussions" is the "default rule." *Id.* at 108. This means that, even though the regulation does not mandate discussions, the agency must at least create a record to justify not using them.

This court recently encountered this same issue and reaffirmed *Oak Grove*. *See IAP Worldwide Servs. Inc. v. United States*, 159 Fed. Cl. 265, 308 (2022) (*IAP Worldwide I*). We understood the "provision's plain language [to] create a presumption in favor of . . . conducting discussions." *Id.* (first alteration in original). With that in mind, the "question, then, [was] how much discretion the Army possesse[d] not to engage in discussions." *Id.* at 307. This court answered, saying that "an agency must justify not engaging

10

in discussions where [DFARS 215.306] applies." *Id.* at 308 (quoting *Oak Grove*, 155 Fed. Cl. at 108).

Turning to the GAO, it too reads DFARS 215.306 to mean that "discussions are the expected course of action in [Department of Defense] procurements valued over $100 million." *Sci. Applications Int'l Corp. (SAIC)*, No. B-413501, 2016 WL 6892429, at *8 (Comp. Gen. Nov. 9, 2016). In *SAIC*, the GAO emphasized "that the [regulation's] operative word" was "should," which meant that "discussions [were] the expected course of action" in these procurements. *Id.* at *8. Agencies can proceed without discussions, then, only "if the particular circumstances of the procurement dictate that making an award without discussions is appropriate." *Id.*

Finally, the Department of Defense itself agrees that DFARS 215.306 creates an expectation that discussions should occur. In an Acquisition Policy Memo, the Department stated that "[f]or acquisitions with an estimated value of $100 million or more, . . . contracting officer[s] should conduct discussions." Memorandum, Dep't of Defense, Defense Procurement Acquisition Policy, ¶ 1.4.2.2.8 (Apr. 1, 2016).

The regulation may make certain defense procurements more cumbersome. The Department "note[d] the potential disadvantages of this proposed change," which included "increased time to complete the source-selection process and additional workload for acquisition staff." Discussions Prior to Contract Award, 75 Fed. Reg. 71,647, 71,648 (Nov. 24, 2010). Nevertheless, it believed that the benefits outweighed the costs because the "failure to hold discussions" "has led to misunderstandings of Government requirements by industry and flaws in the Government's evaluation of offerors' proposals." *Id.* Those both "lead[] to protests that [are] sustained" and ultimately "extend source-selection timelines." *Id.* In any event, whether the government still favors the rule is beside the point. The Department "weighed the [associated] costs," and we do not question its judgment. *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 10 (D.C. Cir. 2015).

It thus appears that there is near universal agreement that DFARS 215.306 creates a presumption that defense agencies will engage in discussions when an acquisition is valued at $100 million or more. Presumably because of this consensus, the government appears to argue that the regulation does not apply if the agency simply chooses from the start not to conduct discussions.

11

We disagree. It is well established that agencies are "bound by the applicable procurement statutes and regulations," *Dell Fed.*, 906 F.3d at 995, and have "no discretion regarding whether . . . to follow" them. *Blue & Gold Fleet v. United States*, 70 Fed. Cl. 487, 512 (2006). Simply put, the government cannot ignore DFARS 215.306, even when it chooses to do so from the start. *See, e.g.*, *IAP Worldwide I*, 159 Fed. Cl. at 307.

While DFARS 215.306 does not mandate discussions, the agency must, at the very least, justify not using them. To that end, we "ask whether the Agency sufficiently justified its decision not to" use discussions in this case. *Oak Grove*, 155 Fed. Cl. at 108–09. In answering that question, we consider only the reasons contained in the administrative record, which in this case do not pass muster. *See IAP Worldwide I*, 159 Fed. Cl. at 309.[8]

The government informs us that the agency's decision not to use discussions was "adequately documented." The only documented reason we found, however, was the agency's statement that the "six highest ranked proposals . . . [were] clearly awardable without discussions [and] present[ed] the best value" to the government. AR 11686. That is not enough.

First, an agency cannot survive scrutiny under DFARS 215.306 with "threadbare, conclusory assertions." *Accord IAP Worldwide I*, 159 Fed. Cl. at 310; *see also Dell Fed.*, 906 F.3d at 986. Instead, an agency must "articulate a rational connection between the facts found and the choice made"; otherwise, its "decision is arbitrary and capricious." *In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021). In this case, the agency never explained how the facts supported its decision to proceed without discussions. At best, the agency merely assumed that SLS could not improve its bid. Assumptions, however, cannot "survive APA review." *IAP Worldwide I*, 159 Fed. Cl. at 311.

---

[8] The government attempts to distinguish *IAP Worldwide I* because it involved draft evaluation notices that strongly suggested a need for discussions. Even though that may be true, the existence of the evaluation notices was only one of six reasons the court held that the record did not justify the agency's decision. *See IAP Worldwide I*, 159 Fed. Cl. at 310–13. Because there were five other reasons, we find that *IAP Worldwide I* is still relevant precedent.

12

Second, "the DFARS presumption favoring discussions must be overcome with reasoned decision-making." *Id.* at 313. Even ignoring the lack of factual support, it still is not clear whether the agency seriously considered whether discussions should be used. Merely repeating the conclusion that the proposals were "clearly awardable without discussions" has little to no value when the agency never planned to use discussions. Indeed, as the government has elsewhere explained, "simply expressing a preference for not following an expected course of action does not . . . foreclose inquiries into whether a reasonable basis exists upon which that preference rests." Redacted Resp. and Reply Brief of Defendant United States, *Dell Fed.*, 133 Fed. Cl. 92, at *4–5 (internal citations omitted). Nothing in the record supports the conclusion that the agency reasonably considered whether discussions would be useful.

Third, accepting the agency's justification for not using discussions—that is, that certain proposals were "clearly awardable" and "represent[ed] the best value"—would effectively nullify DFARS 215.306. *Cf. Duncan v. Walker*, 533 U.S. 167, 167 (2001) (expressing "reluctan[ce] to treat statutory terms as surplusage"). Here, the government assumed that certain offers presented the best value and believed that it could therefore avoid discussions on that basis. But we have already rejected the "implicit assertion that a best value decision may substitute for a determination not to conduct discussions where DFARS 215.306 applies." *IAP Worldwide I*, 159 Fed. Cl. at 312. That is because "every contract award in a best value procurement is premised upon a sound best value decision." *Id.* If the government's self-interested determination that certain offers present the best value could circumvent DFARS 215.306, it is unclear when, if ever, the regulation would apply.

As a last resort, the government and Jacobs both argue that the agency's decision was reasonable because SLS had no "deficiencies or significant weaknesses." Relying on FAR 15.306, they both claim that an agency need only engage in discussions to address "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond."

Discussions about deficiencies and significant weaknesses are a floor, not a ceiling, however. *See* 15.306(d)(3). The contracting officer is also "encouraged" to discuss any aspect of a proposal that could improve its value if altered or explained. *Id.* We do not know why the agency thought that

13

offers could not be enhanced through discussions. The government adopted DFARS 215.306 in part because awards without discussions often led to "flaws in the Government's evaluation of offerors' proposals." *Id.* Thus, an agency cannot avoid DFARS 215.306 simply because it does not assign any deficiencies or significant weaknesses.

In sum, the agency failed to adequately justify its decision not to use discussions. That does not mean that the agency did not have the discretion to proceed without discussions. Instead, we hold only that that "the DFARS presumption favoring discussions must be overcome with reasoned decision-making not reflected in the administrative record." *IAP Worldwide I*, 159 Fed. Cl. at 313.

### B. *Blue & Gold* does not apply.

If an offeror "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process," it "waives its ability to raise the same objection subsequently in a bid protest." *Blue & Gold*, 492 F.3d at 1313. For that reason, the government argues that even if DFARS 215.306 required the agency to justify its decision, SLS waived that argument when it failed to object before the competition concluded.

We disagree. Simply announcing an intent to proceed without discussions does not put contractors on notice that the government intends to violate DFARS 215.306, something the government aptly explained in *Dell Federal*. *See* Redacted Resp. and Reply Brief of Defendant United States, *Dell Fed.*, 133 Fed. Cl. 92, at *9. The government appeared to agree in that case that a challenge to the agency's decision could be brought after the competition concluded. Thus, if agencies reserve the right to hold discussions, *Blue & Gold* will not protect the agency when it eventually foregoes them without explanation.

### C. The agency's violation of DFARS 215.306 prejudiced SLS.

Although we conclude that the agency failed to comply with DFARS 215.306, an agency's error is not enough by itself to merit relief; that error must also be prejudicial. *Office Design Grp. v. United States*, 951 F.3d 1366, 1373 (Fed. Cir. 2020).

14

The agency prejudiced SLS when it violated DFARS 215.306 and proceeded without discussions, which the government does not appear to dispute. If the agency had used discussions, SLS may have had been able to revise aspects of its offer and provide the government with better value. *See Dell Fed.*, 906 F.3d at 996 ("Had the Army conducted pre-award discussions, several of the lower-priced offerors deemed unacceptable—either as a result of ambiguous Solicitation requirements or otherwise—might have revised their initial proposals, which then might plausibly have been found technically acceptable."). Thus, because "a correct application of DFARS 215.306 may have kept [SLS] in the competition [it] is sufficient to demonstrate prejudice." *IAP Worldwide I*, 159 Fed. Cl. at 317.

### III. SLS is entitled to injunctive relief.

At this point, the only remaining question is what relief, if any, is appropriate. SLS seeks a permanent injunction. When issuing an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 24 (2008). In particular, the court must consider four factors: (1) whether the plaintiff succeeds on the merits; (2) whether the plaintiff will suffer irreparable harm without injunctive relief; (3) whether the "balance of hardships" favors the plaintiff; and (4) whether the injunction is in the public's interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). First, for the reasons already discussed, SLS has demonstrated success on the merits.

Second, protesters often show irreparable harm through "evidence of lost profits or evidence that a monetary award would not remedy its damages." *PGBA*, 389 F.3d at 1231. In a similar vein, "a protester [also] suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 384 (2014).

In this case, the agency improperly analyzed price reasonableness and violated DFARS 215.306. Those errors, if left alone, will inflict irreparable harm. Not only will SLS be deprived of a fair chance to compete, *FCN*, 115 Fed. Cl. at 384, but it will also lose the profits it could have obtained through the contract, *Fed. Acquisition Servs. Team, LLC v. United States*, 124 Fed. Cl. 690, 708 (2016).

15

Third, we must "consider whether the balance of hardships leans in the plaintiff's favor, [which] requir[es] a consideration of the harm to the government" and Jacobs. *Id.* While the government does not identify any harm it will suffer from this injunction, Jacobs does.[9] The only hardship that Jacobs identifies, however, is "not being able to perform [its] properly awarded contract[]." As discussed, those awards came from a flawed procurement process. So, when weighed against the irreparable harm that SLS faces, the balance of hardships favors SLS.

Finally, we examine the public interest. When it comes to government contracts, the public has an "overriding . . . interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 379 (2009). Here, the government failed to follow the applicable regulations, and so this injunction is in the public's interest.

In the end, all four factors weigh in SLS's favor. The agency therefore is enjoined from proceeding with performance of the contracts.

## CONCLUSION

In sum, SLS has shown that the agency awarded six contracts for global contingency construction in violation of applicable regulations. First, it improperly analyzed price reasonableness when it failed to request or evaluate pricing information. Second, it violated DFARS 215.306 when it awarded the contracts without adequately justifying its decision not to use discussions. Because these are sufficient grounds to sustain the protest, we need not address SLS's remaining arguments. Accordingly, we order the following:

1. SLS's motion for judgment on the administrative record is granted. The government's and Jacobs's cross-motions are denied.

---

[9] Jacobs goes on to describe some of the agency's harms if we enjoin performance. Because the government can speak for itself (and did not identify any harm), we consider only the harm that Jacobs alleges it will suffer.

2. The agency is enjoined from proceeding with performance of the contracts awarded to Aptim, CDM, ECC, Gilbane, Jacobs, and Perini.

3. If the agency moves forward with the solicitation, it will do so in a manner consistent with this opinion.

4. The Clerk of Court is directed to enter judgment for plaintiff.

5. Costs to plaintiff.

s/Eric G. Bruggink  
ERIC G. BRUGGINK  
Senior Judge